WILLIAM ANDREW RIVELL, M.D.,  *
ALAN B. WHITEHOUSE, M.D.,  *
and THE MEDICAL ASSOCIATION  *
OF GEORGIA,  *
       *
     Plaintiffs,  *
       *
     v.  *     CV 106-176
       *
PRIVATE HEALTH CARE SYSTEMS,  *
INC. and THE CAPELLA GROUP,  *
INC., d/b/a CARE ENTRÉE,  *
       *
     Defendants.  *

## O R D E R

Presently pending before the Court are the parties' cross-motions for summary judgment. (Doc. nos. 208, 211, 213.) For the reasons set forth below, Defendants' motions for summary judgment (doc. nos. 211, 213) are **GRANTED**, and Plaintiffs' motion for summary judgment (doc. no. 208) is correspondingly **DENIED**.

## I. BACKGROUND

This case arises out of the inclusion of certain physicians in a healthcare provider network (the "PHCS Network") assembled by Defendant Private Health Care Systems, Inc. ("PHCS"). Both PHCS and Defendant Capella Group, Inc. ("Capella") marketed and sold access to the PHCS Network. Specifically, PHCS used the Network

and the names of the individual providers included therein to market access to Capella, which in turn used the Network and provider names to market access to individual subscribers. According to Plaintiffs, all such use was without consent and therefore constituted tortious misappropriation of identity. The undisputed facts are recounted below.

### A. The Parties and Their Relationships

Plaintiffs William A. Rivell, M.D. and Alan B. Whitehouse, M.D. are physicians practicing medicine in Evans, Georgia. Dr. Rivell is a solo practitioner of family medicine and Dr. Whitehouse, an otolaryngologist, belongs to a practice group of physicians specializing in the treatment of ailments to the ear, nose, and throat. Plaintiff The Medical Association of Georgia ("MAG") is a non-profit voluntary professional association of Georgia physicians, including Dr. Whitehouse.

Defendant PHCS, a preferred provider organization, assembles networks of physicians, negotiates discounted service rates with network members, and then markets and sells access to these provider networks to insurers, managed health plans, and others. Drs. Rivell and Whitehouse contracted with PHCS to be included in the PHCS Network. Specifically, both doctors contracted indirectly with PHCS in February 1996 through their membership in University Health Link ("UHL"), a physician - hospital partnership in the Augusta area that provides local residents with access to healthcare services through managed care contracts. (<u>See</u> doc. no.

2

222-3.)[1]    Separately, Dr. Rivell contracted directly and individually with PHCS in August 1996. (Doc. no. 222-2.) These agreements will be referred to throughout this Order collectively as the "Network Agreements" or "Agreements."

Defendant Capella, a medical discount card provider, is a former PHCS client. Capella buys access to provider networks like that generated by PHCS and then markets individual consumer access to those networks in exchange for a monthly subscription fee. Capella only offers access to discounted healthcare services, it does not provide health insurance to its subscribers nor does it provide third-party payments to providers. PHCS initially sold access to the PHCS Network to Capella in April 1998, which continued to use the Network until 2009.

### B. Use of the PHCS Network

Following execution of the Provider Agreements in 1996, the names of Drs. Rivell and Whitehouse were included in the PHCS Network. Access to the Network was marketed and sold by PHCS and, after April 1998, marketed and sold by Capella as well.

Prior to 2000, PHCS typically made the PHCS Network available to clients like Capella by distributing hard-copy directories. Thereafter, PHCS made the Network generally available via a website. Capella, in turn, provided subscriber access to the PHCS Network through a member services call center and, later, through a directory available on the company's web site. Drs. Rivell and

---

[1] UHL was formerly known as University Physician Associates, or "UPA."

Whitehouse discovered that their names were being used by Capella after accessing its website directory, and this suit followed.

## C. Procedural History

This action commenced in November 2006 with Plaintiffs purporting to advance a number of different claims, including misappropriation of identity. Defendants subsequently moved to dismiss all claims and the motion was granted. (Doc. no. 63.) The Eleventh Circuit reversed the dismissal, however, and clarified the nature of Plaintiffs' suit – that is, the Eleventh Circuit pronounced that the only claim stated was for misappropriation.[2] Following remand, the complaint was amended to add The Medical Association of Georgia ("MAG") as a Plaintiff. (Doc. no. 107.) While Drs. Rivell and Whitehouse seek damages, MAG seeks only declaratory and injunctive relief.

Plaintiffs then moved for class certification (doc. no. 124), while Defendants moved to dismiss MAG from the action (doc. no. 110). Both motions were denied. (See doc. nos. 156, 133.) Next, Defendants moved for summary judgment, but because only limited class certification-related discovery had taken place at that point the motion was denied without prejudice. (Doc. no. 183.) Following completion of full discovery, the parties filed the cross-motions for summary judgment now before the Court.

---

[2] Rivell v. Private Health Care Sys., Inc., 520 F.3d 1308, 1309 n.1 (11th Cir. 2008) (concluding that, after review, the only claim stated was "Count Five, a claim for appropriation against both PHCS and Capella").

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317(1986)). Before the

Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-

6

movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

Where, as here, the opposing parties have submitted cross-motions for summary judgment, the court need not decide in favor of one party or the other. United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) (noting that cross-motions for summary judgment need not result in the granting of summary judgment). Instead, the court must evaluate each motion on its own merits, just as when only one party moves for summary judgment. See id. In other words, rejecting one cross-motion does not mean that the other must be granted.

The clerk has given the parties notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. nos. 209, 216, 217.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ready for consideration.

### III. DISCUSSION

"The appropriation of another's name and likeness . . . without consent and for the financial gain of the appropriator is a tort in Georgia." Martin Luther King, Jr. Ctr. for Social Change, Inc. v. Am. Heritage Prods., 250 Ga. 135, 143 (1982).

Misappropriation of name or likeness is a form of invasion of privacy, Yarbray v. S. Bell Tel. & Tel. Co., 261 Ga. 703, 704-05 (1991), "consist[ing] of the appropriation, for the defendant's benefit, use or advantage, of the plaintiff's name or likeness." Cabaniss v. Hipsley, 114 Ga. App. 367, 377 (1966). "The interest protected (in the 'appropriation' cases) is not so much a mental as a proprietary one, in the exclusive use of the plaintiff's name and likeness as an aspect of his identity." Id. (internal quotations and citation omitted); see also Restatement (Second) of Torts § 652C cmt. a (1977) ("The interest protected . . . is the interest of the individual in the exclusive use of his own identity . . . the right created by it is in the nature of a property right."). Accordingly, "[r]ecovery under this theory is measured by the unjust enrichment of the defendant and not by the injury to plaintiff's feelings or reputation." Cabaniss, 114 Ga. App. at 381.

Plaintiffs complain that Defendants used the names of Dr. Rivell, Dr. Whitehouse, and MAG members for commercial gain without consent. It is undisputed that PHCS sold access to the PHCS Network, which included Drs. Rivell, Whitehouse, and others, to Capella, which in turn sold access to individual subscribers. This no doubt constitutes beneficial commercial use.[3] As for consent,

---

[3] Both PHCS and Capella have admitted as much. Bill Radler, a PHCS representative, stated: "In a nutshell, PHCS was in the business of providing network services to multiple clients and different client types." (Radler Dep. at 13.) And Eliseo Ruiz, III, Capella's vice president and

Plaintiffs contend that the issue is governed exclusively by the terms of the Network Agreements and that Defendants acted in breach of those Agreements.

The Network Agreements plainly state that PHCS and its customers, designated therein as "companies," "may each use Physician's name, office address, telephone number, specialty and factual description of the practice in directories and other promotional materials." (See doc. nos. 222-2 ¶ 14(b); 222-3 ¶ 15(b).) But Plaintiffs maintain that the terms of the Agreements only allow *certain types* of parties to qualify as "companies," namely, insurance companies, employers, benefit plans, and other payors that offer third-party payments – *not* discount card companies like Capella that do not. According to this argument, the Network Agreements did not grant PHCS authority to sell access to Capella and such use therefore constituted misappropriation. And if PHCS did not have consent to market and sell access to Capella, the argument continues, it follows as a matter of logic that Capella itself did not have consent to use the PHCS Network to secure individual subscriber agreements. Therefore, Plaintiffs assert that they are entitled to summary judgment.

In response, Defendants counter that not only does the evidence presented fail to support an award of summary judgment in Plaintiffs' favor, but it conclusively proves the opposite – that

general counsel, agreed during deposition examination that Capella "received a benefit from the use of the names of the specific doctors in the PHCS Network." (Ruiz Dep. at 169.)

is, that summary judgment in Defendants' favor is merited. Defendants challenge the claims of Drs. Rivell and Whitehouse by arguing that these individuals consented to Defendants' use of their names, either expressly under the terms of the Network Agreements or implicitly through course of conduct. In the alternative, as an affirmative defense, Defendants argue that these claims are barred by the applicable statute of limitations. Finally, Defendants renew their previously filed objection to MAG's presence in this matter, arguing that the association has no standing to proceed.

There are two types of Plaintiffs in this case - individual and association - and the claims will be reviewed accordingly.

### A. Drs. Rivell and Whitehouse's Individual Claims

Pretermitting consideration of the merits, the Court concludes that the claims of Drs. Rivell and Whitehouse are time-barred.[4] In Georgia, the tort of misappropriation of name or likeness is deemed to result in an injury to the person, see Hudson v. Montcalm Publ'g Corp., 190 Ga. App. 629, 633 (1989), and claims asserting as much are therefore controlled by O.C.G.A. § 9-3-33, which provides the following: "Actions for injuries to the person shall be brought within two years after the right of action accrues." The key to applying any statute of limitations is determining the accrual

---

[4] In light of the Court's disposition, Defendants' other arguments need not be addressed. Those arguments assert variously that the claims of Drs. Rivell and Whitehouse must be rejected due to lack of standing; unclean hands; failure to establish damages; and mootness.

date, but on this point § 9-3-33 merely begs the question.  Georgia courts have filled in the blank by applying the now well-established rule that "on a tort claim for personal injury the statute of limitation generally begins to run at the time damage caused by a tortious act occurs, at which time the tort is complete." Everhart v. Rich's, Inc., 229 Ga. 798, 801 (1972); accord Jankowski v. Taylor, Bishop & Lee, 246 Ga. 804, 805 (1980). Moreover, "[m]ere ignorance of the existence of the facts constituting a cause of action does not prevent the running of the statute of limitations." Barrett v. Jackson, 44 Ga. App. 611, 611 (1932).  Assuming, without deciding, that Defendants misappropriated the names of Drs. Rivell and Whitehouse, those torts were complete in 1998 and the limitations period expired in 2000.

The "true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a successful result." Jankowski, 246 Ga. at 806 (quoting Mobley v. Murray Cnty., 178 Ga. 388 (1933)).  "If the act causing . . . damage is of itself unlawful in the sense that it constitutes a legal injury to the plaintiff, and is thus a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, however slight the actual damage then may be." Barrett, 44 Ga. App. at 611.  In short, "the statute of limitations begins to run when the plaintiff's cause of action becomes legally cognizable." M.H.D. v.

Westminster Sch., 172 F.3d 797, 804 (11th Cir. 1999) (applying Georgia law).

Here, the causes of action against both PHCS and Capella accrued on or around June 1, 1998, when the agreement between the two parties was executed. (See doc. no. 222-13.) The agreement date applies to the doctors' claims against both PHCS and Capella because each Defendant made beneficial use of the PHCS Network and the names of the doctors included therein from the date of its execution onward. It is undisputed that the PHCS Network was created from and consisted of the names of providers, including Drs. Rivell and Whitehouse; that access to the Network was commercially marketed and sold by PHCS and Capella; and finally, that PHCS and Capella published the names of the Network providers to users. The doctors premise their claims on precisely this conduct, and as it relates to the doctors' claims, this conduct began on June 1, 1998.

To avoid the limitations bar, Plaintiffs urge the Court to apply the "discovery rule" to their claims. Under this rule, "a cause of action should not accrue until a tort plaintiff knows or with reasonable diligence should know who caused his injury." King v. Seitzingers, Inc., 160 Ga. App. 318, 319 (1981). According to Plaintiffs, they did not learn of Defendants' misappropriation until several years after the misconduct began and the limitations period ought therefore to be tolled until that discovery. To support application of the discovery rule, Plaintiffs contend that

12

the tort of misappropriation is "continuing" in nature.

While Georgia courts apply the discovery rule to continuing torts, see King, 160 Ga. App. at 319, Plaintiffs' reliance on the continuing tort doctrine in this case is misplaced. A continuing tort is defined as "one inflicted over a period of time." Hickey v. Askren, 198 Ga. App. 718, 720 (1991); see also Metlife v. Wright, 220 Ga. App. 827, 828 (1996) (noting that the continuing tort doctrine "has been confined to cases of bodily injury which develop only over an extended period of time"). This general definition alone sheds little useful light; more illuminating is a brief survey of the doctrine's origin and application.

The continuing tort doctrine was first expressly adopted in Georgia in Parker v. Vaughan, 124 Ga. App. 300 (1971), where a patient sued after doctors left a clamp in her abdomen when it was sutured following surgery. While acknowledging the general rule that the limitations period begins to run when the wrong is completed, the Parker court nevertheless held that an exception was warranted under the facts presented. Because the plaintiff's harm was undetectable it "existed in a suspended state of oblivion," id. at 302, and the statute of limitations was therefore tolled until she learned, or through the exercise of ordinary care could have learned, of the harm. Careful not to work too broad an exception to the general rule of accrual, however, the Parker court limited the continuing tort exception to the peculiar circumstances of the case – that is, to "causes of action in which a surgeon negligently

13

leaves a foreign object in the body of his patient."[5]  Id. at 303.

Later cases expanded the continuing tort doctrine modestly to include cases where the plaintiff's injury developed slowly from, and was not obviously traceable to, prolonged exposure to a defendant's tortious conduct.  The doctrine has been applied, for example, where the plaintiff's injury was caused by exposure to toxic fumes, King, 160 Ga. App. at 318-19, where the plaintiff's injury was caused by several years of prescription drug treatment, Piedmont Pharmacy, Inc. v. Patmore, 144 Ga. App. 160, 161-62 (1977), and where the plaintiffs' injuries were caused by years of exposure to toxic chemicals sprayed in their house, Andel v. Getz Servs., Inc., 197 Ga. App. 653, 654 (1990).  The rule yielded by Parker and these later cases is that when an injury is not discernible by the exercise of ordinary care – either because hidden or slow-developing – the statute of limitation is tolled.  See Forgay v. Tucker, 128 Ga. App. 497, 500 (1973) ("[W]hen the injury resulting from a tortious act is not immediately apparent the statute of limitation is tolled so long as the victim could not in the exercise of ordinary care have learned of it . . . .").

This rule is inapposite here.  To be sure, by nature or by stealth, the tort of misappropriation may not always be obvious; presumably for that reason the Georgia General Assembly saw fit to

_____

[5] The narrow holding in Parker has since been codified by O.C.G.A. § 9-3-72: "[W]here a foreign object has been left in a patient's body . . . in such a case an action shall be brought within one year after the negligent or wrongful act or omission is discovered."

apply the discovery rule to claims for trade secret misappropriation, a tort distinct from but operationally akin to misappropriation of name or likeness. See O.C.G.A. § 10-1-766 ("An action for [trade secret] misappropriation must be brought within five years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."). But § 9-3-33, the statute governing Plaintiffs' claims, does not contain a similar legislative directive. Moreover, as explained above, Georgia courts apply the continuing tort doctrine and attendant discovery rule only in very narrow circumstances. Notably, they have not extended the continuing tort doctrine to torts concerning invasion of privacy. See Torrance v. Morris Publ'g Grp., LLC, 281 Ga. App. 563, 566 (2006) (applying the general rule of accrual to a claim for false light invasion of privacy); Sletto v. Hosp. Auth., 239 Ga. App. 203, 207 (1999) (refusing to apply the discovery rule to a claim for public disclosure of private facts); see also Zoll v. Jordache Enter., Inc., No. 01 Civ. 1339, 2002 WL 31873461, at *7 (S.D.N.Y. Dec. 24, 2002) ("[O]nly one [misappropriation] action is recognized, even where a publication is distributed numerous times over an extended period.").

"Georgia courts have warned against indiscriminate extensions of the continuing tort doctrine," Smith v. Tandy Corp., 738 F. Supp. 521, 522 (S.D. Ga. 1990), and the facts presented in this case do not merit its application. Accordingly, the statute of

15

limitations on the misappropriation of name or likeness claims of Drs. Rivell and Whitehouse expired in 2000, six years before this action was filed.[6]    Upon the foregoing, Defendants' motion for summary judgment is **GRANTED** as to the claims of Drs. Rivell and Whitehouse.

### B. MAG's Association Claim

With the Court's leave, MAG joined this action as Plaintiff via an amended complaint following remand from the Eleventh Circuit.    (Doc. no. 107.)    MAG is pursuing a claim of misappropriation - the same claim asserted by Drs. Rivell and Whitehouse - on behalf of its members included in the PHCS Network, members who, according to MAG, do not have the time or financial resources to pursue individual claims.    In response to the claim, Defendants reiterate a threshold objection earlier waged, that MAG

---

[6] The evidence shows that Drs. Rivell and Whitehouse could have discovered the alleged misappropriation through the exercise of ordinary care at or near the time it began.    The doctors were aware or should have been aware that, as parties to the Network Agreements, their names would be included in directories and used for promotional purposes - the Agreements expressly provide as much.    (See doc. no. 222-2 ¶ 14(b); doc. no. 222-3 ¶ 15(b).)    There is no reason to believe that Plaintiffs could not have at anytime thereafter discovered through ordinary care and diligence the name and business type of PHCS's clients or "companies," including Capella. Moreover, PHCS provided written notice of its contract with Capella to UHL, the physician - hospital partnership to which both Drs. Rivell and Whitehouse belonged, in April 1998.    Thus, a simple investigation consisting of inquiries to either PHCS or UHL after this date would have revealed that Capella had contracted with PHCS and, further, that it was a discount card company rather than a payor, the key fact upon which Plaintiffs' syllogistic reasoning hinges.    Because the claims could have been uncovered through the exercise of ordinary care, the discovery rule does not apply.    Even if the discovery rule were applied here, however, it would work to toll the limitations period *only* until such time as the alleged injury could have been discovered with ordinary care, which in this case was at or near the time PHCS and Capella contracted in 1998.    Based on the foregoing, then, the limitations period began in 1998 whether the general rule *or* the discovery rule governs.

lacks standing to proceed. After a review of the record the Court agrees.

"[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005). The Supreme Court has explained its import:

> In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper - and properly limited - role of the courts in a democratic society.

Warth v. Seldin, 422 U.S. 490, 498 (1975) (citations omitted). "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted." Id. at 500 (citation omitted). In every case, the party invoking federal jurisdiction bears the burden of establishing standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

At the outset, MAG contends that the Court need not even reach the substance of Defendants' standing objection because (1) the Court already conclusively disposed of the issue in its favor by allowing MAG's joinder and denying Defendants' previous motion to dismiss MAG for lack of standing, and (2) the presence of Drs. Rivell and Whitehouse in the action makes such review unnecessary.

17

Both of these arguments are without merit.

First, the Court's decision to allow MAG's joinder was a procedural matter only, made pursuant to the command woven into the Federal Rules of Civil Procedure that leave to amend pleadings be granted liberally. See Fed. R. Civ. P. 15, 21. That decision did not touch upon the merits of MAG's standing. As for MAG's contention that the Court's denial of Defendants' earlier motion to dismiss for lack of standing is presently controlling, MAG ignores the import of procedural timing. The nature and extent of a plaintiff's burden to establish standing is a function of the stage to which the litigation has proceeded. Thus, as the Supreme Court has explained:

> Since [the elements of standing] are not mere pleading requirements[,] but rather an indispensable part of the plaintiff's case, each element must be supported the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

Lujan, 504 U.S. at 561 (internal quotations and citations omitted); see also Pennsylvania Psychiatric Soc'y v. Green Spring Health

Svcs., Inc., 280 F.3d 278, 286-87 (3d Cir. 2002) (questioning whether a plaintiff could establish standing, but allowing the suit to proceed on a motion to dismiss while noting that the court "is free to revisit this issue" at a later time). Defendants' previous objection to MAG's standing was raised in a motion to dismiss filed before extensive discovery had been conducted. Careful not to reject standing prematurely, the Court noted in its Order denying that motion that "it would be imprudent to dismiss Plaintiff MAG at this time" because MAG "should be afforded the opportunity to demonstrate that it will be able to prove its misappropriation claim without individual participation." (Doc. no. 133 at 9.) The Order goes on to conclude, however, that if "MAG is unable to demonstrate its claim without individual participation, it will be subject to dismissal, pursuant to a renewed motion by Defendants." (Id.) Far from precluding future review of MAG's standing, then, the Court's earlier ruling explicitly contemplated as much.

Next, MAG relies on the standing of Drs. Rivell and Whitehouse to establish its own. As MAG points out, the Eleventh Circuit has held that "if the Court finds that one of the named plaintiffs has standing to pursue all of the asserted claims, it need not find that the other plaintiffs have standing for those plaintiffs to remain in the suit." Public Citizen, Inc. v. Miller, 992 F.2d 1548, 1552 (11th Cir. 1993); accord Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of [one] plaintiff [with standing], we need not

19

consider whether the other individual and corporate plaintiffs have standing to maintain the suit."). But the Court's dismissal of the claims of Drs. Rivell and Whitehouse renders the rule presently inapplicable. See Gordon v. United States, No. 2:03cv280, 2012 WL 1988711, at *2 (M.D. Fla. June 4, 2012) (holding that plaintiffs did not retain standing following dismissal of their claims). Because there remains no party in the case with independent standing following dismissal of the individual claims, the Court has an obligation to appraise MAG's associational standing to proceed. See Bischoff v. Osceola Cnty., 222 F.3d 874, 878 (11th Cir. 2000) ("'The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines.'" (quoting United States v. Hays, 515 U.S. 737, 742 (1995))).

MAG purports to bring its misappropriation claim not on its own behalf, but on behalf of its members. The Supreme Court has held that an association has standing to do so only when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). This allowance is designed "to facilitate, in a fair and efficient manner, the collective adjudication of the common rights of an association's members." Int'l Union, United

20

Auto. Aerospace & Agric. Implement Workers of Am. v. Brock, 477
U.S. 274, 288 (1986).

In this case, there is no dispute as to the first two
elements. At issue is whether resolution of MAG's claim –
misappropriation of name or likeness – or the relief requested
violates the third prong of Hunt, that is, whether it "requires the
participation of individual members." The Court concludes that it
does.

The vindication of legal rights by representative associations
has several virtues to commend it: it may "promote adversarial
intensity"; "guard against the hazard of litigating a case to the
damages stage only to find the plaintiff lacking detailed records
or the evidence necessary to show the harm with sufficient
specificity"; or "hedge against any risk that the damages recovered
by the association will fail to find their way into the pockets of
the members on whose behalf injury is claimed." United Food &
Commercial Workers Union Local 751 v. Brown Grp., 517 U.S. 544, 556
(1996). But the requirement that associational standing give way
when discrete, individualized inquiries are necessitated – a
prudential rather than constitutional requirement – counsels the
courts to focus on "matters of administrative convenience and
efficiency" when the issue is raised. Id. at 557. And in this
case, the individualized determinations required for final
resolution of MAG's claim undermine this principle.

Misappropriation of name or likeness is a species of the right

of privacy, or "the right of the individual to be let alone."
Pavesich v. New England Life Ins. Co., 50 S.E. 68, 78 (Ga. 1905).
The right is, by definition, an individual and highly personal one.
This may seem a trite point but, while it certainly does not alone
negatively dispose of MAG's associational standing, it nevertheless
bears keeping in mind.    In order for MAG to succeed on its claim,
two things must be shown: (1) Defendants' appropriation of the name
or likeness of MAG members, and (2) that such appropriation
occurred without these individual members' consent.    Pavesich, 50
S.E. at 81; Martin Luther King, Jr., Ctr. for Social Change, Inc.,
250 Ga. at 143.    The first element can be shown with relative ease
- the use to which both PHCS and Capella put the PHCS Network and
directory is plainly demonstrated by the record.

The trouble with MAG's misappropriation claim lies in the
second element:    consent.    The right to use a name or likeness
accrues to the individual, and the individual alone is empowered to
grant consent.    MAG argues that the issue of individual consent may
nevertheless be resolved en masse because the matter is controlled
uniformly and exclusively by the Network Agreements.    This
contention misses the mark, however, because the law does not
dictate that consent be given only by express written contract.
See Rivell, 520 F.3d at 1311 ("The Network Agreements, however, are
merely some evidence of consent or lack thereof . . . ." (emphasis
added)); see also Private Buchanan v. Foxfire Fund, Inc., 151 Ga.
App. 90, 92 (1979) (holding that consent to use of name or likeness

22

was established by "apparent or implied consent"); <u>Pavesich</u>, 50 S.E. at 72 (noting that waiver of the right of privacy "may be either express or implied").

If the terms of the Network Agreements were the fulcrum upon which each member's consent *exclusively* turned, as MAG argues, then the Court could determine the scope of consent and the validity of MAG's claim as a matter of law by construing the terms of the Agreements, without digging into individualized circumstances. After all, contract interpretation is a matter of law for the courts.[7] <u>Claussen v. Aetna Cas. & Sur. Co.</u>, 259 Ga. 333, 334 (1989); O.C.G.A. § 13-2-1. But consent may be granted in a number of different ways, including impliedly through course of conduct, <u>see</u> <u>Buchanan</u>, 151 Ga. App. at 92, and Defendants have raised this very defense.[8] (<u>See</u> doc. no. 212 at 11-12; doc. no. 214 at 7-9.)

---

[7] The Court's rejection of associational standing in this case turns, as will be further explained, on the particular nature of the claim asserted by MAG, i.e., the tort of misappropriation of name or likeness. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted." <u>Warth</u>, 422 U.S. at 500. MAG's claim raises questions of contract interpretation but the key point is that such interpretation cannot *alone* resolve the claim – individualized questions of fact regarding consent must be resolved. A different result could obtain if the claim was instead based *solely* on an alleged breach of the Network Agreements, in which case the Court's interpretation might fully resolve the dispute. That is not how the dispute was presented to the Court, however, and the Court does not pass on that hypothetical case today.

[8] The Court recognizes that the Network Agreements include a modification clause which provides that no modification or amendment is permitted "except by mutual consent in writing to the duly authorized representatives of the Company and the Physician." (<u>See</u> doc. no. 222-2 ¶ 15(a)). But "[w]aiver of a written modification requirement in a contract may be established through the course of conduct between the parties." <u>Gerdes v. Russell Rowe Comm., Inc.</u>, 232 Ga. App. 534, 536 (1998). Moreover, "[w]hether the conduct of the parties constitutes a mutual departure from and a waiver of a contract provision ordinarily is a question of fact for the

Moreover, because the issue of consent is particularized and fact-intensive it is not apt for singular determination in a case involving scores of plaintiffs. See Brown v. NFL Players Ass'n, No. ED CV 11-01953-RGK, 2012 WL 1057995, at *6 (C.D. Cal. Mar. 29, 2012) ("[M]anifestations of consent will necessarily vary from individual to individual."); Rains v. Dolphin Mortg. Corp., 241 Ga. App. 611, 614 (1999) ("Whether a ratification occurred is generally a question of fact for the jury."); cf. Berry v. State, 313 Ga. App. 516, (2012) ("[T]he Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from all the circumstances"). Notwithstanding the individualized character of its claim, MAG contends that associational standing is appropriate here because Defendants' conduct was, in effect, "systematic." That is, the challenged conduct was characterized by a singular and uniform practice that injured each of its individual members in precisely the same manner. This assertion is correct, but incomplete. Owing to the precise nature of the claim asserted, uniformity of practice and injury cannot complete the court's review. Whether that practice was unlawful can only be answered through discrete and individualized determinations. In short, some of the questions

---

jury." Sw. Plaster & Drywall Co. v. R.S. Armstrong & Bros. Co., 166 Ga. App. 373, 374 (1983). The issue of consent is therefore fact-intensive and not well-suited for disposition through judicial declaration, both of which factors militate against associational standing.

raised by MAG's claim are common to its members,[9] but answers to those questions are not.

It is true, as MAG notes, that "the need for *some* individual participation . . . does not necessarily bar associational standing" under the third <u>Hunt</u> prong. <u>Pennsylvania Psychiatric Soc'y</u>, 280 F.3d at 283 (emphasis added). Moreover, claims seeking a declaration, injunction, or some other form of prospective relief, as is the case here, typically qualify for associational standing. <u>See</u> <u>Hunt</u>, 432 U.S. at 343. However, where the plaintiff's claims "require[] a fact-intensive-individualized inquiry," <u>Pennsylvania Psychiatric Soc'y</u>, 280 F.3d at 286, where the fact or extent of injury "would require individualized proof," <u>Warth</u>, 422 U.S. at 515-16, where, in sum, "the nature of the claim and of the relief sought . . . make the individual participation of each injured party *indispensable to proper resolution of the cause*," <u>id.</u> at 511 (emphasis added), associational standing is not warranted. This is the case here.[10] <u>Cf.</u> <u>Kpadeh v. Emmanuel</u>, 261 F.R.D. 687, 690 (S.D. Fla. 2009) ("In cases where the determination

---

[9] In a prior Order, the Court denied Plaintiffs' motion for class certification. (Doc. no. 156.) The Court's present acknowledgment of some measure of commonality of issues should not be construed as inconsistent with that Order. Indeed, the Order itself acknowledged as much. (<u>See id.</u> at 13-15 (concluding that Plaintiffs' action satisfied the commonality requirement of Rule 23(a)(2)).)

[10] The Court made this same point in denying Plaintiffs' motion for reconsideration (doc. no. 191 at 14) following its denial of Plaintiffs' motion for class certification (doc. no. 156): "[T]o make a determination as to consent, . . . a trier of fact would be required to examine not only the impact of the contract terms, but also the subsequent communications between the parties concerning network participants, fee negotiations, and the conduct of individual physicians and the groups through which they may have contracted with PHCS."

of *liability* and/or damages requires a case-by-case inquiry for each prospective plaintiff, courts have generally found the [common question] predominance and superiority requirements of Rule 23(b)(3) unsatisfied." (emphasis added)). The following sampling of cases illustrates the point more concretely.

In Harris v. McRae, 448 U.S. 297 (1980), an association, the Women's Division of the Board of Global Ministries of the United Methodist Church, sought to enjoin enforcement of a federal abortion funding restriction on, among other things, free exercise grounds. The Court noted that the exercise of religion is a highly personalized matter and, as a consequence, free exercise claims require *the individual injured* to show the coercive effect of the challenged action as it operates against *his individual practice of religion*; therefore, such claims "ordinarily require[] individual participation." Id. at 321 (emphasis added). Because the association's free exercise claim could not be adjudicated absent participation of its individual members, the Court concluded that the association lacked standing to pursue the claim. Id.; cf Church of Scientology v. Cazares, 638 F.2d 1272, 1280 (5th Cir. 1981) (holding that a church association had standing to assert a free exercise claim on behalf of its members because, unlike in Harris, "the claim asserted and the relief requested [uniformly] affect[ed] the membership *as a whole*" (emphasis added)).

The same reasoning can be seen at work in Rent Stablization Assoc. v. Dinkins, 5 F.3d 591 (2d Cir. 1993), a case in which an

26

association of building owners sued on behalf of its members seeking declaratory and injunctive relief from New York City's rent stabilization scheme. According to the association, the City's scheme violated the Takings Clause because it did not allow members to earn a just and reasonable return on their property. Even though the association only sought declaratory and injunctive relief, the Second Circuit concluded that the association had no standing. Because "the relief [sought] is only half the story," the court noted, it was required to "examine the claims asserted to determine whether they required individual participation." Id. at 596. And after doing so, the court concluded that the nature of the claim required it to perform "an *ad hoc* factual inquiry for *each* landlord." Id. (emphasis in original). The reason being that when a takings claim is alleged *the claim itself* requires adjudication of an individual owner's reasonable return or viable use, thus necessitating review of a "variety of financial and other information unique to [the owner]." Id. at 597. Associational standing would not have furthered the cause of administrative efficiency so it was rejected.

In contrast to Harris and Rent Stablization Assoc. stand those cases that raise only "pure questions of law." See, e.g., Nat'l Franchisee Ass'n v. Burger King Corp., 715 F. Supp. 2d 1232 (S.D. Fla. 2010) (association brought claim requiring court to interpret contract language); Nat'l Ass'n of Gov't Employees, Inc. v. Barrett, 968 F. Supp. 1564 (N.D. Ga. 1997) (association challenged

the constitutionality of a federal statute). To say that a pure question of law is raised in this context does not necessarily mean that no individual member participation will be required. It means instead that any individualized inquiries are *subordinate* to, not *in addition* to, the question of law presented, and as a consequence a court's resolution of the question ends the judicial proceeding. To illustrate, in Int'l Union, 477 U.S. 274, the issue raised by the union plaintiff was whether the Secretary of Labor had properly interpreted certain eligibility provisions of the Trade Act of 1974. The eligibility of individual union members under the statute would, in turn, depend on unique circumstances particular to each and would therefore require individualized determinations, but that issue devolved administratively upon state authorities – not the presiding court. Id. at 288. The court was tasked solely with resolving a question of statutory interpretation – i.e., a "pure question of law." Id. at 287. Therefore, associational standing was proper.

The guiding considerations when reviewing associational standing – administrative convenience and efficiency – would be ill-served by allowing MAG to proceed. Like the free exercise claim asserted in Harris and the takings claim asserted in Rent Stablization Assoc., the misappropriation of name or likeness claim asserted by MAG demands individualized determinations. And in contrast to Int'l Union, those individualized determinations must be made before judicial proceedings may be brought to an end.

Further, because legal remedies are contingent upon legal claims, the Court may award relief, whether declaratory, injunctive, or otherwise, only in the wake of those determinations. Thus, individual participation is necessitated by both the claim and the relief at issue in this case. There are some shared questions raised by MAG's claim, and the association's presence as Plaintiff would no doubt avoid certain redundancies by collapsing those discrete but identical questions into a single proceeding. But as explained above, that would not end the matter, only a component of it. This result is unsatisfactory.

It is well-established that "[a] litigant may not use a declaratory-judgment action to obtain piecemeal adjudication . . . that *would not finally and conclusively resolve* the underlying controversy," MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 n.7 (2007) (emphasis in original). Doing so would violate the prohibition on court-issued advisory opinions. See Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19 (1995) (noting "that [Article III] gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them . . . because a judicial Power is one to render dispositive judgments." (emphasis in original; internal quotations omitted)). Instead, "[f]or a declaratory judgment to issue, there must be a dispute which calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon *established facts*." Ashcroft v. Mattis, 431 U.S. 171, 171 (1977) (internal quotations and citation omitted;

29

emphasis added). MAG has not presented such facts, nor can it without participation from its individual members. MAG's plea for associational standing is therefore declined, and summary judgment is **GRANTED** in favor of Defendants.

## IV. CONCLUSION

Upon the foregoing, Defendants' motions for summary judgment (doc. nos. 211, 213) are **GRANTED**, and Plaintiffs' motion for summary judgment (doc. no. 208) is correspondingly **DENIED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this _13th_ day of August, 2012.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA